UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KENNETH CHURCHILL,

        Petitioner,

   v.                               Case No. 18-cv-295-pp

UNITED STATES OF AMERICA,

        Respondent.

**ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT
SENTENCE (DKT. NO. 1) AND DISMISSING CASE**

On February 26, 2018, the petitioner, representing himself, filed a
motion to vacate, set aside or correct the sentence imposed in <u>United States v.
Churchill</u>, Case No. 17-cr-31 (E.D. Wis). Dkt. No. 1. The motion asserts that
the petitioner's counsel provided ineffective assistance. Dkt. No. 1. The court
denies the petition and dismisses the case.

I.    **Background**

    A.    <u>Underlying Case</u>

        1.    *Information and plea agreement*

On February 15, 2017, the government filed a one-count information
charging the petitioner with distributing heroin in violation of 21 U.S.C.
§§841(a)(1) and (b)(1)(C). <u>Churchill</u>, Case No. 17-cr-31, Dkt. No. 1. The same
day, the petitioner (represented by Attorney Michael Steinle) signed a plea
agreement. Dkt. No. 2 at 12. The agreement was filed the same day. The
agreement stated that the petitioner was pleading guilty to the count in the
information. <u>Id.</u> at ¶¶2-5. The petitioner acknowledged that he had read and

1

fully understood "the nature and elements of the crime with which he ha[d] been charged" and that his attorney fully explained "the terms and conditions of the plea agreement." Id. at ¶3. The petitioner acknowledged, understood and agreed that he was guilty of the offense in the information. Id. at ¶6. He admitted that the factual basis in the plea agreement established his guilt beyond a reasonable doubt and were true and correct. Id. Those facts provided that

> [f]ederal law enforcement agents received information that [the petitioner] was involved in distributing heroin. Based on this information, the agents conducted several controlled buys of heroin from [the petitioner]. Those transactions occurred on May 11, 2015 (5 grams), May 21, 2015 (10 grams), June 3, 2015 (5 grams), June 4, 2015 (5 grams), July 2, 2015 (10 grams), July 22, 2015 (20 grams), and September 22, 2015 (15 grams). During these transactions, [the petitioner] distributed approximately 70 grams of heroin in total.

> For the July 22, 2015 transaction, an undercover law enforcement agent (UC) who had been involved in a prior controlled transaction with [the petitioner], contacted [the petitioner] on July 21, 2015 and asked if [the petitioner] was able to sell 20 grams of heroin. [The petitioner] responded that he could and they agreed to conduct the transaction the next day. On July 22, 2015, the UC and [the petitioner] exchanged several text messages and ultimately agreed to meet at a Home Depot store parking lot in Milwaukee. Agents set up surveillance of the parking lot and observed [the petitioner] arrive in his Chevrolet Corvette. [The petitioner] was driving and a female was in the passenger seat. UC then approached the driver's-side window of [the petitioner's] Corvette, UC gave [the petitioner] $3000 in prerecorded buy money. [The petitioner] counted the money and directed UC to the otherside of the vehicle. The female in the passenger seat then removed a baggie from her purse and gave it to UC. The baggie contained 20 grams of heroin. Both parties then left the parking lot.

> On October 19, 2015, case agents obtained a federal search warrant to search [the petitioner's] business located at XXXX S. 56th Street, West Allis, Wisconsin, and his residence located at XXXX Holz Drive, Muskego, Wisconsin. That same day, UC contacted [the petitioner] asking if [the petitioner] would sell 35 grams of heroin for $5000.

2

After several text messages, they agreed to conduct the transaction on October 22, 2015.

On October 22, 2015, [the petitioner] directed UC to come to his business to conduct the transaction. Agents were prepared to execute the search warrant at that time. Agents entered the business, located [the petitioner], and took him into custody. [The petitioner] had loaded 9mm Ruger handgun holstered on his right hip and a plastic baggie containing 35 grams of heroin in his pocket.

Shortly after agents executed the warrant at [the petitioner's] business, they executed the warrant at [the petitioner's] residence. During that search, agents recovered a digital scale, a .22 caliber rifle; a .380 caliber Hi-Point handgun; a .40 caliber Glock handgun; a 9mm Springfield Arms handgun; a .45 caliber Taurus handgun; a .45 caliber Ruger P90 handgun; and a box of assorted ammunition. Agents also recovered approximately $17,330.00 in U.S. currency. A search of that currency revealed several bills that matched those provided to [the petitioner] by the UC during the controlled transactions. This includes a $100 bill that had been provided to [the petitioner] by the UC during the July 22, 2015 transaction, and six $100 bills that had been provided to [the petitioner] by the UC during the September 22, 2015 transaction.

Id.

The agreement indicated that the petitioner understood and agreed that the maximum penalty for the charged offense was twenty years in prison, a one million dollar fine and a lifetime of supervised release; he understood and agreed that the count in the information carried mandatory minimum of three years of supervised release and a mandatory special assessment of one hundred dollars. Id. at ¶7. The petitioner acknowledged, understood and agreed that he had "discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney. Id. at ¶8.

The agreement also laid out the elements of the charge. Id. at ¶9. It said that the parties understood and agreed that in order to sustain the heroin distribution charge, the government must prove beyond a reasonable doubt that (1) the petitioner "knowingly distributed a substance containing heroin,"

3

and (2) the petitioner "knew the substance was some kind of controlled substance." Id. The petitioner acknowledged and agreed "that his attorney . . . discussed the applicable sentencing guidelines provisions with him to [the petitioner's] satisfaction." Id. at ¶12. He acknowledged and understood "that the sentencing guidelines recommendations contained in this agreement [did] not create any right to be sentenced within any particular range." Id. at ¶14. The parties acknowledged, understood and agreed that the sentencing court could "consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which [the petitioner] [was] pleading guilty." Id. at ¶15.

The parties "agree[d] to recommend to the sentencing court that the applicable base offense level for the offense charged in Count One is 24." Id. at ¶17. They agreed "to recommend to the sentencing court that a 2-level increase under U.S.S.G. § 2D1.1(b)(1) . . . for possession of a firearm [was] applicable to the offense level for the offense charged in Count One." Id. at ¶18. The government agreed to recommend a 2-level decrease for the petitioner's acceptance of responsibility, "but only if [the petitioner] exhibit[ed] conduct consistent with the acceptance of responsibility." Id. at ¶19. The government agreed that if the court determined at sentencing that the 2-level decrease applied to the petitioner, it would move for an additional 1-level decrease under U.S.S.G. §3E1.1(b) for the petitioner's timely notification of his intent to plead guilty. Id. The parties acknowledged, understood and agreed that "neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement." Id. at ¶23. The agreement indicated that "[t]he United States Probation Office [would] make its own recommendations to the sentencing court," and "[t]he sentencing court [would] make its own

4

determinations regarding any and all issues relating to the imposition of sentence and [might] impose any sentence authorized by law up to the maximum penalties." Id. The petitioner acknowledged, understood and agreed that he could not "move to withdraw the guilty plea solely as a result of the sentence imposed by the court." Id. at ¶24.

The plea agreement provided that if the petitioner "violate[d] any term of [the] agreement at any time, engage[d] in any further criminal activity prior to sentencing, or fail[ed] to appear for sentencing, [the] agreement [would] become null and void at the discretion of the government." Id. at ¶37. If the agreement "[was] revoked or if [the petitioner's] conviction ultimately [was] overturned, then the government retain[ed] the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of [the] agreement." Id. Finally, the petitioner acknowledged, understood and agreed that he was "plead[ing] guilty freely and voluntarily because he [was] in fact guilty," and that "no threats, promises, representations, or other inducements ha[d] been made, nor agreements reached, other than those set forth in [the] agreement, to induce [the petitioner] to plead guilty." Id. at ¶38.

### 2. Arraignment and plea hearing

On March 21, 2017, the court held an arraignment and plea hearing. Dkt. No. 7. The petitioner appeared in person with Attorney Steinle. Id. The court's minutes reflect that during the almost hour-long hearing, the court placed the petitioner under oath, reviewed the plea agreement with him, questioned him, "recounted that the charge involved a maximum prison term of twenty years and a maximum fine of $1,000,000," and mentioned that the charge carried a special assessment of $100 and maximum term of lifetime supervised release. Id. "After [the petitioner] had answered all of the court's

5

questions, the court found that [the petitioner] understood his trial rights, the penalties associated with the charge, the possible civil ramifications of a conviction, and the uncertainty of his ultimate sentence." Id. "The court also found that [the petitioner] entered the plea knowingly and voluntarily, without threats or promises." Id. "The court accepted [the petitioner's] plea of guilty, and found [the petitioner] guilty of the offense charged in the information." Id.

### 3. *Sentencing hearing*

On July 13, 2017, the court held the sentencing hearing. Dkt. No. 30. The petitioner appeared in person with Attorney Steinle. Id. Attorney Steinle confirmed that he and the petitioner had reviewed the presentence investigation report. Id. The government confirmed that it also had reviewed the report, as well as letters written in support of the petitioner. Id. The court explained that the sentencing guidelines in the presentence report were advisory, but that the law required the court to begin its sentencing analysis with those advisory guidelines and consider their application to the factors in 18 U.S.C. §3553. Id. Noting that neither party objected to the guidelines calculations in the presentence report, the court calculated a base offense level of 24, a 2-level increase for the petitioner's possession of a firearm during the offense, a 2-level decrease for acceptance of responsibility under §3E1.1(a) and an additional 1-level decrease under §3E1.1(b), for an adjusted offense level of 23. Id. The court calculated a criminal history category of I; the adjusted offense level of 23 in criminal history category I resulted in an advisory sentencing range of forty-six to fifty-seven months. "Neither party objected to these calculations." Id.

Each party gave their respective sentencing recommendations. Id. at 2. The government recommended that the court impose a sentence within the advisory range. Id. Attorney Steinle began his sentencing remarks as follows:

> MR: STEINLE: Judge, the comments by Mr. Proctor were very fair. I don't agree with his conclusion that [the petitioner] deserves 46 months in prison, though. I can tell you as he's sitting here, he begs for probation. I've told him since the day he walked into my office that this is probably not a probation case. It could have been had there been more cooperation. As you know from the letter, he did cooperate and I think you can take -- even though the government isn't making the motion, I think you can take some of that cooperation into consideration. Although I agree with the government in this negotiation, Judge, he was not charged with a gun, which usually as we all know could have been another five years. And that's a significant benefit that the defendant received as a result of it. And also the charging of the document, obviously the quantity of it also gave him.

Dkt. No. 42 at 10, lines 8-23.

Attorney Steinle then went on for seven and a half pages, discussing the petitioner's heroin addiction, his mother's death, the businesses he built, his family. Id. at 11-17. Attorney Steinle "reminded the court that [the petitioner] had cooperated, even though his efforts had not resulted in the government filing a §5K1.1 motion;" he "asked the court to impose a below-guidelines sentence of twenty-four months, and to recommend the RDAP program." Dkt. No. 30 at 2. The court concluded that a below-guidelines sentence of forty months of incarceration followed by three years of supervised release was sufficient but not more than necessary to take into account the §3553 factors. Id. at 3. The court also imposed a $9,050 fine and a special assessment of $100. Id. The court agreed to recommend that the Bureau of Prisons place the petitioner in a facility as close as possible to the Eastern District of Wisconsin and to recommend that he be placed in a facility that provided the Residential Drug Abuse Program. Id.

At the end of the sentencing hearing, the court advised the petitioner of his appeal rights:

> THE COURT: . . . Mr. Churchill, I do want to tell you that you have a right to appeal the sentence that I just imposed, but you've got a limited timeframe in which to do it. It's 14 days from the day that I send out the written copy of the sentence. That won't be today. It will take me a few days to get it on paper. So once I send out the written copy and Mr. Steinle gets that, and you'll get a copy, too, you've got 14 days from that date.
>
> I tell you that just to let you know that if you're considering appealing, you should talk to Mr. Steinle sooner rather than later because once the 14-day period passes, not the best lawyer in the world can do a whole lot for you. So you want to know that.

Dkt. No. 42 at 43, lines 10-21.

The following exchange then occurred:

> MR. STEINLE:     While we're there, obviously he's not going to appeal a sentence that's below the guideline range, Judge, and all the benefits that he's been given. But we've discussed it. But I will file a letter with the Court after I've completely discussed it after today's date.
>
> THE COURT:     I appreciate that, Mr. Steinle. And while it is a below-guideline sentence, that doesn't necessarily mean that people don't still choose to appeal. So I trust that you will have your usual thorough conversation with Mr. Churchill about that.
>
> MR. STEINLE:     Thanks, Judge.

Id. at 43, lines 22-25; 44, lines1-7.

Attorney Steinle asked the court to allow the petitioner to self-surrender; the government reminded the court of the petitioner's offense and the fact that 18 U.S.C. §3143(b)(2) required remand in most instances. Nonetheless, the court agreed to allow the petitioner to self-surrender. Id. at 44, lines 8-21.

Days later, the court entered judgment. Dkt. No. 31. The judgment reflected the sentence: forty months on Count One followed by three years of supervised release. Id. at 1-3.

4. *Post-sentencing letters*

On July 18, 2017—five days after the sentencing hearing—the court received a letter from Attorney Steinle. Dkt. No. 33. The letter stated:

> The purpose of this letter is to advise that I spoke with my client, Kenneth Churchill about his appellate rights after his sentencing hearing on July 13, 2017. He stated that he understood his rights and advised that he will **not** be appealing this matter.

Id. There was no indication that the letter was copied to the petitioner. No notice of appeal was filed within the fourteen days after the July 13, 2017 sentencing hearing.

On August 11, 2017, the court received from defense counsel a motion asking the court to give the petitioner an additional thirty to sixty days to surrender. Dkt. No. 34. The court denied that motion in a text-only order. Dkt. No. 35.

B.  Petitioner's Motion to Vacate, Set Aside or Correct Sentence

On February 26, 2018—over seven months after the sentencing hearing—the petitioner filed this motion to vacate, set aside or correct his sentence under 28 U.S.C. §2255. Churchill v. United States, Case No. 18-cv-295 (E.D. Wis.), Dkt. No. 1. Citing Strickland v. Washington, 466 U.S. 688 (1984), the petitioner argued that his attorney had been ineffective for several reasons. Id. at 1-2. He argued that although the presentence investigation report indicated that he'd had a gun on his hip on the day he was arrested, his attorney knew that he had a concealed carry permit for business purposes. Id. at 2. The petitioner argued that it was not illegal for him to have the gun at his office. Id. The petitioner argued that his attorney was aware that he had a "sick friend" for whom the petitioner had been obtaining heroin once a month; he said this "sick friend" was the person who had reported him to the FBI and the DEA "as though [the petitioner] was selling drugs and using [his] gun to protect

9

the drugs." Id. at 2-3. The petitioner asserted that this was not true, arguing that the only person he'd sold drugs to was the sick friend and that the sick friend—a confidential informant whom the petitioner had helped—had turned on the petitioner and lied. Id. at 3. The petitioner expressed his view that his attorney had overcharged him and claimed that his attorney "never sat down with [the petitioner] and asked [the petitioner] about the case and the pertinent information that he should have been aware of to make his understanding of [the petitioner's] case complete in his mind." Id. The petitioner asserted that the DEA had been following him for a year and was aware that he was not selling drugs to "anybody else." Id. He argued that for "them" to say that he was using his gun to protect drugs was untrue and that the DEA knew that. Id. at 3-4. The petitioner said that his attorney never asked the government to file a substantial assistance motion under Fed. R. Crim. P. 35, even though the petitioner had cooperated and helped obtain a conviction after working with the DEA for a year and "virtually put [his] life on the line." Id. at 4. The petitioner said that his lawyer told him he would "get a year off for the drug program and would be out in 16 to 18 months at most," that the petitioner would receive six months of halfway house time and good-time credit. Id. The petitioner asserted that because he received a 2-level enhancement for possessing the gun, he could not get the year off even if he had taken the program and that the gun enhancement increased his sentence. Id.

The petitioner asserted that the day of the sentencing, he asked his attorney to file a direct appeal. Id. The petitioner says that his attorney responded, "it would cost you too much money and we would have to go to Chicago. Besides you will only do 16 to 18 months." Id. at 4-5. The petitioner argued that this showed that his attorney was not interested in his case and

10

didn't want to be bothered; the petitioner expressed his understanding that all cases "are normally appealed" and opined that his lawyer should have appealed when the petitioner asked him to do so. Id. at 5. Finally, he argued that he'd asked his attorney to get his Corvette and $17,333 in cash that had been taken from his home returned to him, stating that "[t]hat money that they took could easily be justified as to where it came from." Id. He indicated that his lawyer failed to do this. Id.

On July 13, 2020, the court screened the §2255 motion. Dkt. No. 3. The court noted that while the petitioner had not appealed his underlying criminal case, the petition raised an ineffective assistance of counsel claim. Id. at 4. Finding that claim cognizable under §2255 and not subject to the exhaustion requirement, the court ordered the respondent to respond. Id. at 4-5.

The government filed a timely response. Dkt. No. 4. It first asserted that several of the petitioner's claims might be moot, given that he was released from prison in June 2020. Id. at 6. The government argued that because the petitioner appeared to be attacking the length of his sentence and his inability to participate in or benefit from prison programming, rather than the conviction itself, he could not assert a concrete injury-in-fact that can be remedied through vacating or correcting the sentence. Id. at 7-8. The government also argued that the petitioner's attorney was not ineffective; it asserted that the 2-level enhancement for possession of the gun was proper and that the petitioner had agreed to its application in the plea agreement, id. at 10-13; it argued that contrary to his assertions, the petitioner had received credit for his cooperation, both in the fact that he was allowed to plead to crimes that did not carry mandatory minimum sentences (despite facts that would have supported charges that did carry such penalties) and the fact that

the court stated at sentencing that it took into account his cooperation, id. at 13-15; it argued that §2255 is not an appropriate vehicle for addressing Bureau of Prisons policies (such as the policy that someone with a gun enhancement cannot participate in some programming), and that circumstantial evidence indicated that Attorney Steinle's statements about getting time off for programming likely were made after the sentencing and thus would not have affected the petitioner's decision to plead guilty, id. at 15-16; it argued that the record contradicts the petitioner's assertion that he asked Attorney Steinle to file a notice of appeal and that Steinle did not do so, id. at 16-19; and it argued that the petitioner's complaints about his attorney's failure to retrieve forfeited property is not cognizable under §2255, id. at 19.

The government filed an affidavit from Attorney Steinle. Dkt. No. 4-1. The affidavit provides that the petitioner hired Attorney Steinle to negotiate a plea agreement. Id. at ¶2. It avers that the plea agreement that the parties ultimately filed "reduced the quantity of heroin that [the petitioner] was responsible for under the federal guidelines and [the petitioner] was allowed to plead to a charge without a mandatory minimum sentence." Id. at ¶¶3-4. Attorney Steinle avers that the petitioner "agreed to the two (2) point enhancement pursuant to USSG 2D1.1 with an agreement to not be charged with the 924(c) count which would have carried a mandatory five (5) year consecutive sentence." Id. at ¶5. He avers that he explained the guidelines concepts to the petitioner at various stages of the proceedings and that the petitioner never asked him to object to the presentence report. Id. at ¶6. The affidavit avers that after sentencing, Attorney Steinle explained the petitioner's appeal rights to him and his partner and explained to the petitioner that there were no legitimate appellate issues; Steinle avers that "it was agreed that an

12

appeal would not be filed on [the petitioner's] behalf." Id. at ¶¶8-9. Steinle averred that on July 18, 2017, he sent the petitioner a closing letter; he indicates that had the petitioner wanted to appeal, Steinle would not have closed the case, but would have negotiated a new fee agreement for the appeal. Id. at ¶10. Finally, Steinle averred that he met with the petitioner several times after the sentencing hearing, and that while the petitioner asked Steinle to request additional time to self-surrender and asked about having his property returned, he never asked Attorney Steinle to appeal. Id. at ¶11.

## II.  Analysis

### A.  Standard

Under 28 U.S.C. §2255, a federal prisoner may ask the court that imposed his sentence to vacate, set aside or correct that sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]" 28 U.S.C. §2255(a).

"Relief under § 2255 is available 'only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice.'" United States v. Coleman, 763 F.3d 706, 708 (7th Cir. 2014) (quoting Blake v. United States, 723 F.3d 870, 878-79 (7th Cir. 2013)). If "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[,]" the court need not hold an evidentiary hearing. 28 U.S.C. §2255(b); Sandoval v. United States, 574 F.3d 847 (7th Cir. 2009) ("The court should grant an evidentiary hearing on a § 2255 motion when the petitioner 'alleges facts that, if proven, would entitle him to relief.'")

13

B.    Mootness

Stating that as of June 2020, the petitioner is on supervised release, the government asserts that the petitioner's claims may be moot. Dkt. No. 4 at 6. The government concludes that the petitioner's "key complaints relate to (1) a two level adjustment in the calculation of his sentencing guidelines; (2) advice from his counsel that he would receive 'a year off' of his 40-month sentence if he participated in a BOP drug treatment program, and (3) his counsel's alleged failure to ask the government to file a motion under Rule 35 to reduce his prison sentence." Id. It contends that "the Court cannot undo the prison sentence [the petitioner] has already completed," and that "several of [the petitioner's] claims may be dismissed for failure to allege a 'concrete injury in fact' that can be remedied through a 2255 motion." Id. at 8.

While the government discusses caselaw generally applicable to Article III standing and the custody requirement of §2255, it cites no authority to support its speculation that the petitioner's challenge to particular aspects of his sentence may be moot under the circumstances of this case. A challenge to a sentence that a petitioner already has served is not moot when relief might shorten the petitioner's period of supervised release. U.S. v. Larson, 417 F.3d 741, 747 (7th Cir. 2005). "When a former inmate still serving a term of supervised release challenges the length or computation of his sentence, his case is not moot so long as he could obtain 'any potential benefit' from a favorable decision." Pope v. Perdue, 889 F.3d 410, 414 (7th Cir. 2018) (quoting United States v. Trotter, 270 F.3d 1150, 1152 (7th Cir. 2001)).

> It is true that a finding that Pope spent too much time in prison would not automatically entitle him to less supervised release. *United States v. Johnson*, 529 U.S. 53, 59–60 . . . (2000). Nevertheless, such a finding would carry "great weight" in a § 3583(e) motion to reduce Pope's term. *Id.* at 60 . . . . This is enough.

14

> *See United States v. Epps*, 707 F.3d 337, 345 (D.C. Cir. 2013); *Mujahid v. Daniels*, 413 F.3d 991, 994–95 (9th Cir. 2005).

Id.

The petitioner began his three-year period of supervised release on June 26, 2020. https://www.bop.gov/inmateloc/ (Kenneth D. Churchill, Register Number 16057-089). The petitioner's claims are not moot.

  C. <u>Ineffective Assistance of Counsel</u>

    1. *Applicable law*

"Under *Strickland v. Washington*'s familiar, two-pronged test for ineffective assistance of counsel, [the petitioner] must demonstrate that (1) his counsel's performance was deficient; and (2) that deficiency resulted in prejudice." <u>United States v. Berg</u>, 714 F.3d 490, 496-97 (7th Cir. 2013) (citing <u>Strickland</u>, 466 U.S. at 687). The first prong of the <u>Strickland</u> test requires a petitioner to identify specific acts or omissions of his counsel; the court then considers whether, in light of all of the circumstances, his attorney's performance fell outside the range of "professionally competent assistance." <u>Wyatt v. United States</u>, 574 F.3d 455, 458 (7th Cir. 2009) (citing <u>Coleman v. United States</u>, 318 F.3d 754, 758 (7th Cir. 2003)). The court's review of an attorney's performance must be "highly deferential," and the court applies a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689; <u>Wyatt</u>, 574 F.3d at 458. The prejudice prong requires a petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. "A reasonable probability is defined as one that is sufficient to undermine confidence in an outcome." <u>Adams v. Bertrand</u>, 452 F.3d 428, 435 (7th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694).

In the context of a guilty plea, the prejudice prong requires a petitioner to show a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." United States v. Smith, 989 F.3d 575, 581 (7th Cir. 2021) (quoting Lee v. United States, __ U.S. __, 137 S. Ct. 1958, 1965 (2017)). "Courts must 'not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.'" Id. (quoting Lee, 137 S. Ct. at 1967). "We instead 'look to contemporaneous evidence to substantiate a defendant's expressed preferences' and allow a withdrawal if we are convinced that the defendant would have pleaded differently." Id. (quoting Lee, 137 S. Ct. at 1967).

2. *Petitioner's ineffective assistance of counsel claims*

a. Application of the Gun Enhancement

The petitioner argues that Attorney Steinle performed ineffectively because Attorney Steinle "knew very well that [the petitioner] possessed a concealed carry weapon and permit for [his] business," and that the petitioner "owned limousine service and dealt with large amounts of cash on a regular basis." Dkt. No. 1 at 2. He urges that "it was not illegal for this Petitioner to have a gun at his office." Id. Stating that Attorney Steinle was "even more deficient because he was very well aware that Petitioner had a 'sick friend' for whom he had secured heroin for during the prior eight (8) to nine (9) months, once a month," the petitioner stresses that his "sick friend" "was the person that set Petitioner up to be caught by the FBI and DEA as though [he] was selling drugs and using [his] gun to protect the drugs." Id. at 2-3. He argues that "[t]his is totally untrue," and that he "[does] not and [has] not sold drugs to anybody but this one sick friend." Id. at 3.

16

The government responds that the plain text of §2D1.1(b)(1), along with language from the relevant Application Notes, "shows that the 2-level enhancement applies to the undisputed facts of the case." Dkt. No. 4 at 11. And, the government recounts, the petitioner agreed to the application of the enhancement when he signed the plea agreement. Id. at 12. The government concludes that "any objection by defense counsel to the 2-level enhancement under U.S.S.G. § 2B1.1(b)(1) would have been (1) a breach of the plea agreement, and (2) meritless in light of the facts that [the petitioner] agreed were true and correct." Id. at 12-13.

To the extent the petitioner argues that Attorney Steinle was ineffective because he did not adequately explain the plea agreement or the §2D1.1(b)(1) gun enhancement to the petitioner, the claim lacks merit. Paragraph 18 of the plea agreement said, "The *parties* agree to recommend to the sentencing court that a 2-level increase under U.S.S.G. § 2D1.1(b)(1) . . . for possession of a firearm is applicable to the office level for the offense charged in Count One." Churchill, Case No. 17-cr-31, Dkt. No. 2 at ¶18 (emphasis added). The final page of the plea agreement bears the petitioner's signature next to the date of February 15, 2017. Id. at 12. By signing the plea agreement, the petitioner agreed to recommend that the court apply the 2-level increase to the base offense level because he possessed a firearm.

Both in the plea agreement and at the plea colloquy the petitioner indicated that he entered into the plea agreement knowingly, voluntarily and intelligently, that he understood his rights and how his sentence might be calculated, that he admitted to the facts in the plea agreement and that no promises had been made to him outside of the plea agreement. Representations made to a court during a plea colloquy are presumptively true. Hurlow v.

17

United States, 726 F.3d 958, 968 (7th Cir. 2013) (quoting United States v. Chavers, 515 F.3d 722, 724 (7th Cir. 2008)). Assuming that everything the petitioner said at the plea colloquy was true, what he says in his §2255 motion must be false. "Judges need not let litigants contradict themselves so readily; a motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." United States v. Peterson, 414 F.3d 825, 827 (7th Cir. 2005). The undersigned presided over both the plea hearing and the sentencing hearing; there was no evidence at either hearing that the petitioner did not enter into the plea agreement voluntarily, knowingly and intelligently. There is no evidence in the record to support a claim that Attorney Steinle failed to explain the agreement to the petitioner, and significant evidence to the contrary.

As for whether the petitioner's attorney was ineffective in failing to object to the enhancement, he was not. Section 2D1.1(b)(1) says that "[i]f a dangerous weapon (including a firearm) was *possessed*, increase by **2** levels." https://www.ussc.gov/guidelines/2016-guidelines-manual/2016-chapter-2-d#NaN (emphasis added). The Guideline makes no exceptions for someone who has a permit or who has a legal reason for possessing the gun.[1]

---

[1] The petitioner asserts that if his attorney had "made . . . plain" to the probation department that he had a concealed carry permit allowing him to use the gun in connection with his business, "there would not have been a two point enhancement for the gun." Dkt. No. 1 at 5. This assertion is incorrect for two reasons. First, as the court has noted, having a permit or having the gun for an otherwise lawful purpose does not mean that the gun was not "possessed" in connection with drugs. The probation department could have— and in all likelihood would have—recommended the 2-level enhancement even if the petitioner's attorney had explained to them that the petitioner had obtained the gun for business purposes and had a permit for it. Second, the petitioner assumes that the probation department is responsible for deciding

18

The relevant portion of Application Note 11(A) to the guideline states:

> The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet.

Id. The Seventh Circuit has construed the application note as imposing a "twofold burden." United States v. Sanchez, 989 F.3d 523, 544 (7th Cir. 2021) (quoting United States v. Thurman, 889 F.3d 356, 372 (7th Cir. 2018)). "First, the Government must prove by a preponderance of the evidence that the defendant possessed a weapon either actually or constructively, meaning he 'had the power and the intention to exercise dominion or control of the firearm." Id. (quoting Thurman, 889 F.3d at 372). "Second, '[i]f the Government satisfies this burden, then the defendant must show that it is "clearly improbable [that] he possessed the weapon in connection with the drug offense."'" Id. quoting Thurman, 889 F.3d at 372).

The factual basis in the plea agreement indicated that on October 19, 2015, an undercover agent agreed to buy thirty-five grams of heroin from the petitioner. Churchill, Case No. 17-cr-31, Dkt. No. 2 at 3. Three days, later the petitioner directed the undercover agent to come to his business to make the exchange. Id. At that time, agents executed a search warrant, entered the business and took the petitioner into custody. Id. When the agents took the petitioner into custody, he had a "loaded 9mm Ruger handgun holstered on his

---

whether to impose an enhancement under the Guidelines. It is not. The *court* decides whether to impose an enhancement and may do so regardless of whether probation, the government or the defendant recommend (or object to) the enhancement.

right hip and a plastic baggie containing 35 grams of heroin in his pocket." Id. These facts establish by a preponderance of the evidence that the petitioner possessed the gun, and he has not disputed the fact that he possessed the gun.

The petitioner argues, however, that he did not possess the gun in connection with distributing heroin; he says he had a permit to carry it and did so because he "had rental properties that were in bad areas" and because he "owned a limousine service and dealt with large amounts of cash." Churchill, Case No. 18-cv-295, Dkt. No. 1 at 2. He asserts that the DEA had been following him for a year and knew that it was not true that he was using the gun to protect his drugs. Id. at 3-4. It may well be that the petitioner purchased the gun, and used the gun, to protect himself in bad neighborhoods and to protect himself from theft of the cash from his limousine business. But the Seventh Circuit has held repeatedly that "guns found in close proximity to drug activity are presumptively connected to that activity." Thurman, 889 F.3d at 372 (quoting United States v. Bothun, 424 F.3d 582, 586 (7th Cir. 2005)). The court has held that "[r]egardless of whether [a defendant] initially procured the guns for reasons unrelated to the drug trade, their locations relative to" drug paraphernalia and drug transactions "sufficiently indicate their connection to" the drug trafficking offense. Id. at 373. The petitioner's conclusory and unsworn assertion that the loaded gun he had on his hip when he was found in possession of thirty-five grams of heroin comes nowhere near meeting his burden of demonstrating that it was "clearly improbable" that he possessed the gun in connection with drug dealing. This is especially true given that the gun was loaded and that at the petitioner's home, the agents found five more handguns and a rifle.

20

The petitioner asserts that his attorney was aware that in the months leading up to his arrest, the petitioner was obtaining heroin for only one person other than himself—his "sick friend," who ended up being the informant who turned on him—and that he was not selling drugs to make a living. The petitioner asserts that if his attorney had "made . . . plain" to the probation department "that Petitioner only secured heroin once a month for a friend that was a confidential informant, then there would not have been a two point enhancement for the gun." Dkt. No. 1 at 5.

The petitioner does not deny that he supplied heroin to another person or that he did so more than once. The petitioner was not aware when he was providing the heroin to this other person that that person was relating information to the DEA. The petitioner supplied the informant twice in May 2015, twice in June 2015 and twice in July 2015 (belying his argument that he provided heroin only once a month). All told, the petitioner sold the informant some seventy grams of heroin over the course of the investigation. On the day he was arrested, the petitioner had thirty-five grams of heroin in his pocket— some 350 100-mg doses. Agents recovered in his house a digital scale, ammunition, several guns and over $17,000, which included some of the marked buy money given the petitioner by the informant. Even if defense counsel had told probation that the only person the petitioner was supplying was the informant, probation likely still would have recommended the 2-level enhancement and this court would have applied it; again, the proximity of the gun to the drugs in the petitioner's pocket was sufficient to justify the enhancement.

Further, at the time it imposed sentence, the court was aware that the petitioner did not consider himself a drug dealer. At sentencing, the petitioner

21

provided the court with his written statement. Dkt. No. 1 at 23, lines 8-15. Among other things, the statement said, "One thing I can tell you, if I wasn't under the influence I would never have gotten the DEA drugs." Id. at lines 23-25. The petitioner stated, "I've never sold drugs in the 48 years . . . prior to this incident." Id. at line 25; 24 at line 1; 25 at lines 8-19. The petitioner characterized his offense as "one mistake." Id. at 24, line 4. The court addressed that fact in its sentencing comments, discussing the fact that the petitioner described what he had done as "a mistake":

> THE COURT:      . . . But the thing that concerns me a little bit about people saying that you made only one mistake, Mr. Churchill, is twofold: Number one, a mistake is something that we do accidentally. We don't think about it, we don't choose to do it. You know, my glasses and your glasses are sitting on the table and I pick up yours instead of mine and it was a mistake.
>
> At some point in time you made a decision to go from putting stuff in your body—which was bad enough and which was destroying you and your health, but impacted you and the people you love—you made a decision from going to putting it in your own body to putting it out there on the street for other people.
>
> That wasn't a mistake, that was a choice. I know it was a choice that you repeated over and over, at least as far as we know, one, two, three, four, five—six times, but I'm fairly certain more than that otherwise the DEA never would have drifted across you.

Id. at 29, lines 12-25; 30, lines 1-3.

Even if defense counsel had told probation and this court that the petitioner insisted that he had only ever sold heroin to the DEA informant, the court cannot say that probation or the court would have believed that representation under the circumstances. Even if the court had believed that representation, it would not have changed the fact that the petitioner was arrested with a loaded gun and a significant amount of heroin and that he had more guns, a scale, ammunition and a large amount of cash in his home.

To prevail on an ineffective assistance of counsel claim, the petitioner must demonstrate that his attorney's failure to object to the enhancement (or to preserve his right to object in the plea agreement) prejudiced the petitioner. The petitioner cannot prove prejudice. Given the petitioner's simultaneous physical possession of a loaded handgun and thirty-five grams of heroin and the presence in his home of five more handguns, a rifle and cash, as well as the fact that the petitioner agreed to the enhancement in the plea agreement, the court cannot imagine that it would have sustained any objection the petitioner's attorney would have made to the enhancement.

The petitioner argues that he was prejudiced because the enhancement resulted in his receiving a longer sentence. He has not proven this. Without the 2-level enhancement, the petitioner's adjusted offense level would have been 21. Churchill, Case No. 17-cr-31), Dkt. No. 26 at ¶39. Under the 2016 Sentencing Guidelines Manual (the version used to calculate the petitioner's sentence, id. at ¶29), level 21 in criminal history category I would have resulted in an advisory sentencing range of thirty-seven to forty-six months. https://www.ussc.gov/guidelines/2016-guidelines-manual/2016-chapter-5. The sentence the court imposed—forty months—is at the lower end of that range. The petitioner has not demonstrated that the court would have imposed a lower sentence without the enhancement.

The petitioner asserts that he was prejudiced by his attorney's failure to object to the 2-level gun enhancement in another way. He asserts that the enhancement prevented him from earning a year off his sentence for "doing the drug program." Dkt. No. 1 at 4. As part of its sentence, the court recommended that the petitioner be placed at a facility that offered the Residential Drug

23

Abuse Program. The RDAP is the BOP's intensive, residential drug treatment program, typically nine months in duration. https://www.bop.gov/inmates/ custody_and_care/substance_abuse_treatment.jsp. Section 3621(e)(2)(B) of Title 18 provides that an incarcerated person convicted of a nonviolent offense who successfully completes a residential substance abuse program such as RDAP may have his sentence reduced by the BOP by no more than one year. Under 28 C.F.R. §550.55(b)(5)(ii), however, a person is ineligible for this early release if he has a current felony conviction for an offense that "involved the carrying, possession, or use of a firearm . . . ."

The Supreme Court has held that the regulation prohibiting persons convicted of felonies that involved the carrying, possession or use of a gun "is a permissible exercise of the Bureau[] [of Prisons'] discretion under 18 U.S.C. § 3621(e)(2)(B)." Lopez v. Davis, 531 U.S. 230, 233 (2001). The petitioner appears to believe that if his attorney had objected to the imposition of the 2-level enhancement, and if the court had sustained that objection and not imposed the enhancement, he would have been eligible for up to one year off his sentence if he had completed the RDAP program. The petitioner assumes that if the court had not imposed the enhancement, the BOP would not have known about the loaded gun on his hip in his office or the guns found in his house. But the presentence report—including the factual basis—is "made available to the Bureau of Prisons." Fed. R. Crim. P. 32(i)(3)(C). Regardless of whether the court imposed the 2-level enhancement, the BOP would have known that the petitioner had a loaded gun and thirty-five grams of heroin in his pocket at the time of his arrest, and that he had handguns and a rifle in his house.

The petitioner cannot, and has not, demonstrated that his attorney's failure to object to the 2-level gun enhancement prejudiced him.

### b.    Failure to Talk with the Petitioner

The petitioner asserts that Attorney Steinle "never sat down with [the petitioner] and asked [the petitioner] about the case and the pertinent information that [Steinle] should have been aware of to make his understanding of [the petitioner's] case complete in [Steinle's] mind." Churchill, Case No. 18-cv-295, Dkt. No. 1 at 3. To the extent the petitioner argues that Attorney Steinle did not adequately explain the plea agreement to him when he states that Attorney Steinle "never sat down" with him, the court has concluded that this claim lacks merit in light of the petitioner's acknowledgments in the plea agreement and his sworn statements during the plea colloquy.

### c.    Failure to File a Rule 35 Motion[2]

The petitioner complains that Attorney Steinle "never seeked [sic] to have the Prosecutor to file a Rule 35 Motion for the substantial assistance that [the petitioner] gave to the DEA in connection to a drug dealer;" the petitioner states that "[b]ecause of [his] assistance, the DEA did get a conviction," but that he has "received no help from them." Id. at 4.

As to the petitioner's argument that his attorney was ineffective because he did not try to convince the prosecutor file a Rule 35 motion, this argument implies that the petitioner is aware that only the government may seek a sentence reduction for substantial assistance. Fed. R. Crim. P. 35(b)(1)

---

[2] The petitioner contends that Attorney Steinle overcharged him. This claim is not cognizable under §2255. The petitioner was not required to retain Attorney Steinle.

provides that "[u]pon the government's motion," the court may reduce a defendant's sentence. More to the point, Rule 35 allows the government to request a sentence reduction if the defendant provided substantial assistance "*after* sentencing." Rule 35(b)(1) (emphasis added). Attorney Steinle cannot have been ineffective in failing to convince the prosecutor to file a Rule 35 motion, because Rule 35 motions address post-sentencing cooperation and the petitioner provided cooperation *pre*-sentencing.[3]

As to the petitioner's argument that he received no credit for his cooperation, the government disagrees. Stressing Attorney Steinle's and this court's comments at sentencing, the government asserts that the benefits the petitioner received for his cooperation "are clear from the record." Dkt. No. 4 at 14. The government explains that the factual basis in the plea agreement demonstrates that the petitioner delivered more than seventy grams of heroin in several controlled transactions and that at the time of his arrest he possessed thirty-five grams of heroin that he intended to deliver to an undercover agent; that "[u]nder 21 U.S.C. § 841(a)(1) and (b)(1)(B), this conduct can lead to a mandatory minimum of five years in prison;" that the petitioner possessed a firearm "during the anticipated heroin transaction on October 22, 2017" in violation of 18 U.S.C. §924(c)(1)(A)(i), which carries a mandatory minimum sentence of five years in prison that must be imposed consecutive to any other sentence; and that despite all this, the petitioner "was allowed to

---

[3] If the government wants to seek a reduced sentence for a defendant who cooperates *before* sentencing, it files a motion for a downward departure under U.S.S.G. §5K1.1. The government did not do that in this case because it credited the petitioner's cooperation in a different way—by allowing him to plead to a charge that did not carry a mandatory minimum and by not charging him under 18 U.S.C. §924(c). Dkt. No. 24 at 2.

plead guilty to one count of distributing heroin, which carried no mandatory minimum sentence." Id.

The court disagrees, as well. There is no question that the petitioner received credit for his cooperation. Before sentencing, the government filed under seal a letter to the court, describing what the petitioner had done. Dkt. No. 24. The letter characterized the petitioner's cooperation as "very useful to law enforcement in the investigation and prosecution of another person," "generally truthful and complete" and involving "a degree of risk" to the petitioner. Id. at 1. The government explained that it was largely because of the petitioner's cooperation that the petitioner was allowed to plead to a drug charge that did not carry a five-year mandatory minimum and that the government agreed not to charge the petitioner with a possessing a gun during a drug offense in violation of 18 U.S.C. §924(c)(1)(A)(1), a crime that would have carried a five-year mandatory minimum consecutive to any other sentence. Id. at 2. Had the petitioner not cooperated, he could have been facing a mandatory minimum sentence of ten years in prison; instead, he faced no mandatory minimum.

To the extent that the petitioner is arguing that Attorney Steinle was ineffective because he made no effort to get the petitioner credit for his cooperation, the argument fails for the same reasons discussed above. Even assuming that Attorney Steinle made did nothing before pre-charging or pre-sentencing to convince the government to credit the petitioner for his cooperation—and the charge to which the petitioner was allowed to plead as well as the charge that was not filed utterly belie this assumption—Attorney Steinle argued at sentencing that "even though the government isn't making the motion" for a sentence reduction based on cooperation, "I think you can

27

take some of that cooperation into consideration." Dkt. No. 42 at 10, lines 15-17. He referenced the government's pre-sentence letter describing the petitioner's cooperation. Id. at lines 14-15. Attorney Steinle characterized the petitioner's cooperation as accepting responsibility, noting that the petitioner "did that without a lawyer and he did it long before [Attorney Steinle] was involved in his life. He did that without counsel whatsoever. He jumped on board. He did what he had to do." Id. at 14, lines 13-17. Attorney Steinle said that the petitioner had done "everything that he could with the connections he had," and that the petitioner had been "extremely cooperative" and the "personification of acceptance." Id., lines 21-25. Attorney Steinle asked the court to give the petitioner even more credit for his cooperation than he'd already received through the government's charging decisions.

The petitioner has not demonstrated that his attorney's performance was deficient or that he was prejudiced.

d.      Misrepresentation of the Drug Treatment Program

The petitioner argues that Attorney Steinle told him that he "would get a year off for the drug program and would be out in 16 to 18 months at most." Dkt. No. 1 at 4. He says that instead, he "got a 2-point gun enhancement which prevent[ed] [him] from getting the year off even if [he] did take the program," and "the 2-point enhancement increased [his] prison time." Id. The petitioner stresses that "because of Counsel's lies on [the petitioner] to the Probation Department and giving them the false belief that [the petitioner] was using the gun to protect the drugs, the Probation Department gave me a 2-point enhancement." Id. at 5.

The petitioner has presented no evidence that *Attorney Steinle* gave the probation office the impression that the petitioner was using a gun to protect

drugs. It was the *government* that provided probation with the factual basis for the plea. And it was the court, not probation, that imposed the 2-level enhancement for the gun.

Both the plea agreement and the court's admonishments at the change-of-plea hearing made it clear to the petitioner that the guidelines calculations and the sentence were up to the court—not probation. The plea agreement stated that the petitioner acknowledged, understood and agreed that United States Probation Office was neither a party to nor bound by the agreement. Churchill, Case No. 17-cr-31, Dkt. No. 2 at ¶23. It also makes clear that it was the *court*, not the probation department, that would make the final calculation of the guidelines. Id. The agreement clarified that other than the promises in the plea agreement, no threats, promises, representations or other inducements had been made, or agreements reached, to induce the petitioner to plead guilty. Id. at ¶38. The petitioner signed that agreement. Id. at 12. The petitioner's statements and responses to the court's questions at the plea hearing also demonstrated that the petitioner entered his plea knowingly, voluntarily and intelligently and not because of any promises not reflected in the plea agreement. Again, if the petitioner's signing of the plea agreement and his statements to this court under oath at the plea hearing were true—and the court must assume they were—his statements months later that Attorney Steinle promised him a certain sentence are false.

Perhaps, as the government surmises, after the sentencing hearing, Attorney Steinle told the petitioner how much time Attorney Steinle thought the petitioner was likely to serve and turned out to be wrong. "An inaccurate prediction of a sentence alone is not enough to meet the [*Strickland*] standard."

29

Spiller v. United States, 855 F.3d 751, 757 (7th Cir. 2017) (quoting Bethel v. United States, 458 F.3d 711, 717 (7th Cir. 2006)).

The petitioner has not demonstrated that Attorney Steinle's performance was deficient or that the petitioner was prejudiced.

e.     Failure to File a Direct Appeal

The petitioner states that

> [o]n July 13, 2017 after I was given a 40 month sentence and a $9000.00 restitution, Petitioner asked Counsel if he would file a Direct Appeal of his sentence. Counsel responded to me with these words: "it would cost you too much money and we would have to go to Chicago. Besides you will only do 16 to 18 months." This shows that Counsel was not interested in my case and did not want to be bothered. All cases, as I understand, are normally appealed and he should have appealed it when I requested him to do so.

Dkt. No. 1 at 4-5.

Attorney Steinle's affidavit avers that although he explained "guideline concepts to [the petitioner] in great detail at various stages of the negotiations including prior to the plea agreement, when the plea agreement was signed and in preparation of the sentencing hearing," the petitioner never asked Attorney Steinle to file any objections to the presentence investigation report. Dkt. No. 4-1 at ¶6. Attorney Steinle avers that he explained the petitioner's appellate rights to the petitioner after sentencing. Id. at ¶8. He says that "after an explanation to [the petitioner] that there were no appellate issues that legitimately could have been raised by an appeal, it was agreed that an appeal would not be filed on his behalf." Id. at ¶9. Attorney Steinle avers that he met with the petitioner several times after sentencing, and that although the petitioner "never requested [Steinle] to file an appeal," he did "request that [Steinle] ask the Court for additional time to surrender to the Federal Bureau of Prisons which [Steinle] did do for him on August 11, 2017." Id. at ¶11. The

30

petitioner also asked Attorney Steinle about "return of property issues but never requested an appeal of the matter in any of those conversations." Id.

The government observes that "[the petitioner] does not allege that, after receiving Attorney Steinle's advice, [the petitioner] insisted on filing a notice of appeal." Dkt. No. 4 at 17. The government argues that "it appears [the petitioner] accepted Attorney Steinle's advice, but he now believes an appeal should have been filed as a matter of course." Id. It concludes that "[t]he record establishes that [the petitioner] did not insist on a notice of appeal;" the government reasons that at the sentencing hearing, Attorney Steinle indicated that "he had already discussed the right to appeal with [the petitioner], and that he would do so again after the hearing and file a letter with the Court." Id. at 17-18. The government points to Attorney Steinle's post-sentencing letter indicating that the petitioner would not be appealing. Id. at 18. Referring to Attorney Steinle's attached affidavit, the government stresses that Attorney Steinle explained the petitioner's appellate rights to the petitioner and the petitioner's partner after the sentencing hearing. Id. The government argues that at that time, the petitioner agreed with Attorney Steinle that "there were no valid issues to raise on appeal;" it says that at other post-sentencing meetings, the petitioner never asked Attorney Steinle to file an appeal. Id.

The government argues that if the petitioner believes that Attorney Steinle should have filed an appeal regardless of the petitioner's instructions, that belief is not supported by the law or the facts. The government reasons that (1) "the argument is simply wrong on the law," id. (citing Gant v. United States, 627 F.3d 677, 681 (7th Cir. 2010)); (2) the petitioner's admission that he discussed his appellate rights with Attorney Steinle indicates his understanding "that filing an appeal was not a matter of course but instead a

31

decision to be made in light of the facts and circumstances," id.; and (3) the petitioner "pleaded guilty, preserved no issues for appeal, obtained a favorable plea agreement from the government, and received a sentence below the advisory guidelines," id. at 19.

"[C]ounsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Roe v. Flores-Ortega, 528 U.S. 470, 480 (2000). A court must take into account all the information counsel knew or should have known; in cases involving a guilty plea, the plea "reduces the scope of potentially appealable issues and . . . may indicate that the defendant seeks an end to the judicial proceedings." Id.

The record demonstrates that Attorney Steinle complied with his constitutional duty to consult with the petitioner about an appeal. He told the court at the sentencing hearing that he'd discussed appeal with the petitioner prior to the hearing. The petitioner says that he talked with Steinle about an appeal after the hearing. Steinle advised the court in the post-sentencing letter that he had discussed the petitioner's appeal rights with him, and Steinle reiterated that in his affidavit in connection with this motion.

"Where . . . a defendant has expressly requested an appeal, counsel performs deficiently by disregarding the client's instructions." Garza v. Idaho, __ U.S. __, 139 S. Ct. 738, 746 (2019). To succeed on a claim that his attorney was ineffective for failing to comply with his request to file a direct appeal, "a defendant must show that he actually requested his attorney file an appeal."

32

<u>Gant v. United States</u>, 627 F.3d 677, 681 (7th Cir. 2010) (citing <u>Castellanos v.</u> <u>United States</u>, 26 F.3d 717, 719 (7th Cir. 1994)).

The petitioner has provided no evidence that he clearly requested that Attorney Steinle file an appeal and Attorney Steinle did not comply with his request. The petition was not signed under penalty of perjury. It was not verified under 28 U.S.C. §1746. The petitioner states that he "asked Counsel if he would file a Direct Appeal of his sentence," and that Attorney Steinle replied by discussing the cost and logistics of an appeal and the likely amount of time the petitioner would serve. The petitioner does not aver—or even state—that after hearing from Attorney Steinle, he clearly directed Attorney Steinle to file a notice of appeal regardless of cost, distance or the amount of time he would serve.

The petitioner's incomplete version of events squares with Attorney Steinle's more complete—and sworn—version. Attorney Steinle avers that after the sentencing hearing, he had a discussion with the petitioner and the petitioner's partner about appeal options. Attorney Steinle avers that after this discussion, "it was agreed" that an appeal would not be filed. The fact that Attorney Steinle advised the petitioner against appealing and that the petitioner did not reject that advice does not equate to a clear request that Attorney Steinle file an appeal.

Circumstantial evidence also indicates that the petitioner did not make a clear request to Attorney Steinle to appeal. At the sentencing hearing, Attorney Steinle told the court—without contradiction from the petitioner—that he'd already discussed appeal options with the petitioner and that the petitioner was not going to appeal given the fact that he'd received a below-guidelines sentence and the ability to plead to a charge with no mandatory minimum and

33

the government's forbearance of the §924(c) charge. Five days after the sentencing hearing, the court received Attorney Steinle's letter, explaining that he'd discussed the petitioner's appeal rights with him and that the petitioner would not be appealing. After the sentencing hearing, Attorney Steinle did something else the petitioner had asked him to do—he filed a motion asking the court to delay the petitioner's self-surrender date and accompanied it with an affidavit. Dkt. Nos. 34, 34-1. It makes little sense that Attorney Steinle would follow that instruction and not an instruction to appeal. The petitioner filed his §2255 motion over seven months after the sentencing hearing. The motion does not indicate that the petitioner thought Attorney Steinle had filed an appeal for him and that he'd found out months later that this was not the case.

The petitioner has not demonstrated that he clearly requested that Attorney Steinle file a notice of appeal and that Attorney Steinle was deficient in failing to do so.

f.      Failure to Recover Petitioner's Property

Finally, the petitioner argues that Attorney Steinle failed to "get [the petitioner's] Corvette back as well as the $17,333.00 that the government took from Petitioner's home." Dkt. No. 1 at 5. He says that "[t]hat money that they took could easilybe [sic] justified as to where it came from." Id. The government responds that the seizure and forfeiture of the Corvette and cash occurred before the government charged the petitioner. Dkt. No. 4 at 19. The government contends that because the claim is unrelated to the petitioner's conviction or sentence, it falls outside the scope of §2255. Id.

Performance of counsel in a civil forfeiture proceeding does not implicate the Sixth Amendment. Anderson v. United States, 215 F.3d 1329 (7th Cir.

34

2000) (Table) (citing <u>United States v. Indoor Cultivation Equip.</u>, 55 F.3d 1311, 1317-18 (7th Cir. 1995)). A challenge to the forfeiture of property is not otherwise cognizable under §2255. <u>Id.</u>

## III.    Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2255 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. <u>See</u> 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Peterson v. Douma</u>, 751 F.3d 524, 528 (7th Cir. 2014) (citing <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)). The court declines to issue a certificate of appealability, because no reasonable jurist could debate that the petitioner's claims do not warrant relief under 28 U.S.C. §2255.

## IV.    Conclusion

The court **DENIES** the petitioner's motion to vacate, set aside or correct his sentence. Dkt. No. 1.

The court **DECLINES** to issue a certificate of appealability.

The court **ORDERS** that the case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 19th day of October, 2022.

BY THE COURT:

_____

HON. PAMELA PEPPER
**Chief United States District Judge**

35